# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RITA HUMBLE,** | : | **No. 3:07cv1464** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| | : | |
| **v.** | : | |
| | : | |
| **LIBERTY LIFE ASSURANCE** | : | |
| **COMPANY OF BOSTON,** | : | |
| **Defendant** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

### MEMORANDUM

Before the court are the parties' motions for summary judgment.  Having been

fully briefed and argued, the matter is ripe for disposition.

**Background**

This case arises from plaintiff's appeal of defendant's termination of her long-

term disability benefits pursuant to the Employee Retirement Income Security Act

(ERISA).  Plaintiff, who was employed as Operations Manager by Geisinger Health

System, made a claim for such benefits after she became disabled due to a kidney

transplant and polycystic kidney disease.   (Statement of Material Facts in Support of

Plaintiff's Motion for Summary Judgment (Doc. 16) (hereinafter "Plaintiff's

Statement") at ¶ 2; Statement of Undisputed Material Facts of Defendant (Doc. 18)

(hereinafter "Defendant's Statement) at ¶¶ 2-3).[1]  Defendant Liberty Life provided

---

[1]The parties each filed a separate statement of material facts, and only defendant
filed a response to the opposing party's statement.

Geisinger with coverage; under the plan, if found disabled, plaintiff was entitled to 66.67% of her weekly salary from the time she was forced to stop working, less any social security benefits she received.  (Plaintiff's Statement at ¶ 4).

Plaintiff underwent kidney transplant surgery on March 16, 2004. (Defendant's Statement at ¶ 4).  She took a medical leave from her position at Geisinger on that date.  (Id.).  Plaintiff submitted an application for long-term disability benefits to defendant in August 2004.  (Plaintiff's Statement at ¶ 3).  To be eligible for such benefits, plaintiff had to show that she was unable to perform her job for 180 days (an "elimination period") after she commenced leave from work for her disability.  (Defendant's Statement at ¶ 5).  Plaintiff thus became eligible for long-term disability benefits under defendant's policy on September 12, 2004.  (Id.). Plaintiff was eligible for twenty-four months of benefits under this policy.  (Id. at ¶ 6). During this period, the plan defined plaintiff as disabled if she had to show that "as a result of Injury or Sickness, [she was] unable to perform the Material and Substantial Duties of [her] Own Occupation."  (Disability Insurance File of Liberty Life Insurance Company for Rita Humble (Doc. 13) (hereinafter "R.") at LL-0006).  To be eligible for disability after this initial twenty-four-month period, plaintiff had to show that she was "unable to perform the Material and Substantial Duties of Any Occupation" for which she was "or becomes reasonably fitted by training, education, experience, age physical and mental capacity."  (R. at LL-0005-6).

In connection with plaintiff's application for these benefits, defendant

2

requested plaintiff's medical records and other information about her condition. (Defendant's Statement at ¶ 7). The records received from this request included information from Dr. Nicole Alu which confirmed that plaintiff's kidney transplant and continuing health problems made it impossible to return to her nursing position. (Id.). Dr. Alu found that the high stress of the job and danger of exposure to infection made return to the hospital inappropriate. (Id.). Based on this information, defendant approved disability payments for plaintiff on September 8, 2004. (Id. at ¶ 8).

As part of normal procedure under the long-term disability policy, defendant continued to monitor plaintiff's condition after this initial determination. (Id. at ¶ 9). Liberty received updated medical reports on plaintiff's condition. In April 2005, Dr. Mark Finger, a board-certified doctor in internal medicine and nephrology, examined plaintiff's medical records. (Id. at ¶ 10). He confirmed that her condition presented a continued high risk of infection, and found that plaintiff remained unable to return to her previous employment because of the dangers of patient contact. (Id.). Defendant made further investigation into the conditions of plaintiff's work and found that she indeed came into frequent contact with patients. (Id.). Accordingly, the defendant determined that plaintiff remained disabled under the terms of the policy and continued her disability coverage. (Id.).

Liberty Life continued to request and receive medical information from the plaintiff during 2005 and early 2006. Plaintiff completed an "activities questionnaire"

3

for defendant on December 9, 2005.  (See R. at LL-0722-24).  She related that she could sit for two hours and stand and walk for an unlimited period of time.  (Id. at LL-722).  Plaintiff spent three hours a day sitting, eight hours standing and an hour walking.  (Id.).  Plaintiff frequently left the house each week, was able to walk outside at least three times a week, and worked in her garden wearing gloves.  (Id.).  She could not wash her car or work on her house.  (Id.).  Plaintiff performed many household tasks, such as grocery shopping, cooking, vacuuming and doing laundry. (Id. at LL-0723).  She could also care for her personal hygiene.  (Id.).  Plaintiff related that her condition and the dangers of infection it posed prevented her from engaging in the patient care required in her profession of nursing.  (Id. at LL-0724).

The Defendant wrote plaintiff on August 21, 2006 to inform her that her disability status would change on September 11, 2006.  (Defendant's Statement at ¶ 15).  Plaintiff would no longer be covered by the policy that recognized her as disabled if she could not work the position in which she was employed at the onset of her disability.  (Id.).  In order to continue receiving benefits, plaintiff would have to demonstrate that she suffered from a medical condition that prevented her from working altogether.  (Id.).  The company warned that it was collecting information to determine whether she was eligible for the policy benefits, and that a determination that she was not eligible could come at any time after September 11.  (Id.).

Plaintiff underwent a nephrectomy, removing her right kidney, on June 30, 2006.  On December 1, 2006, Liberty also wrote to plaintiff's treating physicians,

4

asking them to assess the company's determination that plaintiff could return to work in sedentary positions.  Two of plaintiff's doctors, Dr. Bart Fulmer and Dr. Santosh Potdar, agreed that she could return to this sort of work.  (See R. at LL-0367; LL-0041).  A third doctor's repose was somewhat ambiguous, but did not state that plaintiff could not return to work in a sedentary capacity.  Dr. Alu disagreed, stating that plaintiff "has not been trained to work in a 'sedentary capacity.'  I do not feel this is appropriate and that she continues to be disabled from her regular work activities."

On September 15, 2006, plaintiff completed another "activities questionnaire" for defendant.  (See R. at LL-0540-42).   Plaintiff related that she had her right kidney removed on June 30, 2006.  (Id. at LL-0542).  She left the house daily, went outside for walks daily unless the weather was bad, and worked in the garden.  (Id. at LL-0540-41).  Plaintiff could not, however, work on the house or wash her car.  (Id. at LL-0540).  With the help of her husband, plaintiff shopped for groceries.  (Id.  at LL-0541).  Her husband carried their groceries, and plaintiff and her husband put them away at home.  While plaintiff cooked the meals, she and her husband worked together to clean up afterwards.  (Id.).  Plaintiff did other work around the house, such as cleaning bathrooms (with her husband), vacuuming and doing laundry.  (Id.).  Plaintiff could take care of all her personal grooming needs.  (Id.).  In that document, plaintiff related that she could sit for 1 ½ to two hours, stand for two hours, and walk for 45 minutes.  (Id. at LL-0540).  Plaintiff reported that her problems with immunity prevented her from working at her previous occupation, and that joint pain prevented

her from doing any other work.  (Id. at LL-0542).

Defendant used experts to determine plaintiff's capacity to work.  Dr. Amy
Hopkins, certified in internal and occupational and environmental medicine,
examined plaintiff's medical records in March 2006.  (See R. at LL-0361-65).
Hopkins issued a report on March 16, 2006.  (Id. at LL-0361).  Dr. Hopkins found
that because of plaintiff's "permanent immunocompromised status, she is
permanently restricted from working in direct patient care or in environments with
high likelihoods of infectious disease exposure." (Id.).  This limitation, however,
would "Not preclude her from working in ordinary office environments." (Id.).  Pain
experienced by plaintiff due to enlarged kidneys also meant that she should be
confined to "sedentary or light level work." (Id.).  In the event that plaintiff required
removal of a kidney, "she will have a postoperative recovery period during which
time she will be unable to work at all." (Id.).  Hopkins found that plaintiff suffered
from "musculoskeletal complaints" caused by various physical ailments meant that
"she should probably be restricted to light work so as not to aggravate the pain with
heavy lifting." (Id.).  Plaintiff summarized the medical evidence provided by plaintiff's
doctors, as well as the activities questionnaire provided by plaintiff to support her
conclusions about plaintiff's work capabilities.  (Id. at LL-0634-35).

On March 22, 2006, Patricia Thal, a vocational expert employed by the
defendant examined the plaintiff's records and prepared a "transferable skills
analysis and labor market information" report.  (See R. at LL-0628-29).  Thal

reviewed the claim file and consulted "standard vocational resources," but made no contact with plaintiff.  (Id. at LL-0628).  In evaluating plaintiff's medical status and functional capacity, Thal adopted Dr. Hopkins's recommendation that plaintiff be restricted to "sedentary or light level work."  (Id.).  Thal also found that plaintiff could no longer work in "direct patient care" because of the risks of exposure to infectious diseases, though she could work in an "ordinary office."  (Id.).  Thal noted that plaintiff was a high school graduate who possessed a nursing diploma.  (Id.).  She was employed as a registered nurse and supervisor for more than thirty years, the last twenty-three at the Geisinger Wyoming Valley Medical Center.  (Id.).  Based on this experience, Thal found that plaintiff possessed a set of "transferrable skills," which included "oral and written communication; analytical skills; patient care; knowledge of medial terminology; medical record maintenance; assessment of patient health problems and needs; [and] management skills." (Id.).  Thal proposed three occupations that plaintiff could perform, given her training and physical limitations: "Telephonic Advice Nurse, e.g. Ask-a-Nurse; Precertification Nurse; and Utilization Review Nurse."  (Id. at LL-0369).

On February 20, 2007, the defendant determined that plaintiff was no longer eligible for total disability payments, notifying her by correspondence dated February 23, 2007.  (Plaintiff's Statement at ¶ 7).  In its letter to plaintiff, defendant informed her that her disability insurance was terminated on February 20, 2007 because she had "not continued to meet the Geisinger System Services Group Disability Income

Policy requirements," which required that after the first twenty-four months of

disability coverage she show that she is "unable to perform, with reasonable

continuity, the Material and Substantial Duties of Any Occupation."  (R. at LL-0114).

The defendant defined "'any occupation'" as "any occupation that the Covered

Person is or becomes reasonably fitted by training, education, experience, age,

physical and mental capacity."  (Id.).  After listing contacts with various of plaintiff's

doctors about restrictions on her daily activities and describing the review process

undertaken by Liberty physicians and vocational experts, the defendant informed

plaintiff that it had determined she could work as a "Telephonic Advice Nurse,

Precertification Nurse, and Utilization Review Nurse."  (Id. at LL-0115).  Since "[a]

review of [plaintiff's] claim has determined that [she has] no restrictions or limitation

which would preclude work in a sedentary occupation in an office setting," defendant

determined that plaintiff's claim should be denied.  (Id.).

Plaintiff appealed this decision, writing defendant to explain the reasons for

her appeal.  Two factors, plaintiff argued, supported her claim for long-term disability

benefits.  First, she continued to suffer from a compromised immune system.  (See

letter from Rita Humble to Elizabeth Kiernan, dated March 16, 2007, R. at LL-0353).

This condition meant that plaintiff suffered frequent minor illnesses such sore throats

and coughs and colds.  (Id.).  If forced to return to work, these illnesses would mean

that plaintiff would have to take sick days regularly.  (Id.).  Second, plaintiff found that

the jobs which the company suggested she was capable of performing were ones

she had "no experience in or knowledge of." (Id. at LL-0354).  Her career as a nurse had centered around patient care, and she had no interest or experience with "insurance and payor practices." (Id.).  Further, plaintiff had worked for Geisinger Health Systems for more than twenty years, and would "not look outside the system for employment." (Id.).  Only two of the jobs offered on-line by Geisinger, plaintiff reported, fit the capacities the defendant said she possessed.  (Id.).  Despite this complaint, the company affirmed that opinion on June 4, 2007.

In investigating plaintiff's appeal, defendant sought additional information from her doctors.  Defendant wrote to plaintiff's treating physicians on April 3, 2007, requesting records collected since September 2006.  (See Letter to Dr. John Rothschild, R. at LL-00350; Letter to Dr. Nicole Alu, R. at LL-0349).  Defendant also employed Dr. Robert Millstein, a consulting physician, to review plaintiff's medical records and assess her claim.  (See R. at LL-0194).  Lisa Gray, the company representative handling plaintiff's appeal, wrote to Dr. Millstein requesting that he "determine claimant's level of functional capacity effective February 2007," when the company determined she could perform "alternative occupations." (Id.).  Gray asked Millstein to address Dr. Alu's contention that plaintiff could not perform any occupation.  (Id.).  She pointed out that many of the medical reports had been collected more than a year previously, and that "new medical has been received since then." (Id.).  Dr. Millstein, Gray directed, should speak to Dr. Alu about plaintiff's capacities.  (Id.).  Gray also informed Dr. Millstein's that his evaluation

9

should address the question whether, if "taking into consideration all of claimant's conditions/impairments, would this claimant have the functional capacity to perform the alternative occupations identified on the TSA and of course taking into consideration her low WBC state."  (Id.).

Dr. Millstein delivered his report on May 14, 2007.  (Id. at LL-0197-LL-0205). He found that plaintiff could perform "sedentary or possibility light duty work within an office environment," but should be "restricted from working in a hospital setting where she might be exposed to resistant organisms."  (Id. at LL-0197).  Plaintiff remained "somewhat immunocompromised given her use of immunosuppressive medications despite only an occasional minimal depression in white blood cell count."  (Id.).  Dr. Millstein also reported that he had spoken with Dr. Alu in reference to her opinion that plaintiff lacked the capacity to perform sedentary work.  (See Letter from Dr. Millstein to Dr. Alu, dated May 22, 2007, at LL-206).  In that letter, Dr. Millstein asked Dr. Alu to agree that the two had spoken about plaintiff's physical capacities, and that Dr. Alu agreed that plaintiff "from a physical standpoint . . . has the ability to perform full time sedentary jobs."  (Id.).  At the same time, Dr. Alu worried that plaintiff "may not have the appropriate training or experience to perform" the jobs suggested by defendant's vocational experts.  (Id.).  Plaintiff points to no evidence, such as an affidavit from Dr. Alu, that contradicts Dr. Millstein's version of this conversation.  Dr. Millstein reported that he made use of the records supplied by plaintiff's treating physicians in reviewing her file.  (Id. at LL-0196).  These records

10

covered the years between 2004 and 2007 and included patient records, lab reports and doctors' opinions.  (Id.).

On August 9, 2007, plaintiff filed an action in this court pursuant to ERISA, contending that the defendant erred in denying her benefits under the plan.  (Doc. 1). The parties engaged in discovery.  After the close of discovery, both sides filed motions for summary judgment.  They then briefed the issues and the court held argument, bringing the case to its present posture.

**Jurisdiction**

As this case is brought pursuant to the Employee Retirement Income Security Act, 29 U.S.C. §1101, *et seq.*, we have jurisdiction pursuant to 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

**Legal Standard**

The case is before the court on the parties' motions for summary judgment. Granting summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (citing FED. R. CIV. P. 56(c)). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be

no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

247-48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the

facts in the light most favorable to the party opposing the motion.  International Raw

Materials, Ltd. v. Stauffer Chemical Co., 898 F.2d 946, 949 (3d Cir. 1990). The

burden is on the moving party to demonstrate that the evidence is such that a

reasonable jury could not return a verdict for the non-moving party. Anderson, 477

U.S. at 248 (1986).  A fact is material when it might affect the outcome of the suit

under the governing law. Id.  Where the non-moving party will bear the burden of

proof at trial, the party moving for summary judgment may meet its burden by

showing that the evidentiary materials of record, if reduced to admissible evidence,

would be insufficient to carry the non-movant's burden of proof at trial. Celotex v.

Catrett, 477 U.S. 317, 322 (1986).

In this case the court's task is to evaluate defendant's decision to deny plaintiff

long-term disability coverage under a policy regulated by the ERISA statute.  The

standard of review for an action brought under section 1132(a)(1)(B) of ERISA is not

set forth in the statute.  The United States Supreme Court has held that  courts

should ordinarily apply a *de novo* standard of review in assessing a plan

administrator's denial of ERISA benefits. Firestone Tire & Rubber Co. v. Bruch, 489

U.S. 101, 115 (1989).  However, where the ERISA plan commits discretion to the

plan administrator, the reviewing court applies an arbitrary and capricious standard.

Skretvedt v. E.I. DuPont de Nemours and Co., 268 F.3d 167, 173 (3d Cir. 2001).

Under the "arbitrary and capricious" standard, a reviewing court must defer to the

plan administrator unless its decision was without reason, unsupported by

substantial evidence, or erroneous as a matter of law. Id. at 173-4.

Where the plan administrator is a acting under a conflict of interest, that

conflict of interest must be weighed as a factor in determining if its decision is

arbitrary and capricious. Firestone, 489 U.S. at 115. The Third Circuit Court of

Appeals has identified two instances where a special danger of conflict of interest

warrants the application of a "heightened arbitrary and capricious" standard of

review. These two instances are: 1) where the pension plan is unfunded, in other

words, where the employer funds the pension plan on a claim-by-claim basis as

opposed to the employer making fixed contributions to the pension fund; and 2)

where the plan is administered by an entity outside of the employing company, for

example, an insurance company, that does not have strong incentives to keep

employees satisfied by granting meritorious claims. Skretvedt, 268 F.3d at 174

(citing Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 388 (3d Cir. 2000)).

With regard to the second scenario, the Third Circuit has more particularly

determined that it is appropriate to utilize a heightened standard of arbitrary and

capricious review when an insurance company both determines eligibility for benefits

and pays those benefits from its own funds. Pinto, 214 F.3d at 383, 387. The

court's reasoning is that there is a strong incentive for the insurance company to

deny benefits when the fund from which benefits will be paid is the same fund from which the insurance company receives its profits. Id. at 378.  In such cases, courts are to utilize a "sliding scale" approach, according different degrees of deference depending on the apparent seriousness of the conflict. Id. at 391.  The court explained that the arbitrary and capricious standard is a range, not a point.  The standard becomes more penetrating the greater the suspicion of partiality and less penetrating the smaller that suspicion is. Id. at 392-3.  The greater the evidence of conflict, on the part of the plan administrator, the less deferential the court should be. Id. at 393.

Each case must be examined on its own facts when the sliding scale approach is used.  Relevant factors that can be taken into account include, *inter alia*, the sophistication of the parties, the information accessible to the parties, and the exact financial arrangement between the insurer and the employer. Id. at 392.  The Pinto court found the following procedural anomalies to be relevant in that case and enough to place the level of review at the far end of the arbitrary and capricious range: the plan administrator treated the same facts inconsistently by reversing its own initial determination of total disability; selective, self-serving, use of a doctor's expertise; and rejecting the recommendation of a staff worker that the claimant be reestablished pending further testing.  Further, "[t]he premise of the sliding scale approach is that courts should examine benefit denials on their facts to determine whether the administrator abused its discretion." Post v. Hartford Ins. Co., 501 F.3d

14

154, 161 (3d Cir. 2007).  "At its best, the sliding scale reduces to making a common-sense decision based on the evidence whether the administrator appropriately exercised its discretion.  This theme, rather than getting bogged down in trying to find the perfect point on the sliding scale, should be district courts' touchstone."  Id. at 162.

In the instant case, we will employ the arbitrary and capricious standard of review because the plan administrator has discretion to interpret the terms of the Plan and to determine eligibility for and entitlement to, plan benefits.   In addition, the plan administrator is the defendant insurance company; therefore, the special danger of conflict of interest warrants the use of the heightened arbitrary and capricious standard described by the Third Circuit in Pinto.  The parties agree that defendant plays this dual role in coverage decisions.

**Discussion**

Plaintiff points to two reasons why we should overturn the plan administrator's decision and grant her disability benefits under the policy.  We will address each in turn, using the standards articulated above.

### a.  Failure to Rely on Treating Physicians

First, plaintiff complains that defendant did not rely on the findings of plaintiff's treating physicians in making its disability determination, but instead gave undue credence to the opinions of a physician the company employed to review medical records.  Central to plaintiff's argument is the opinion of Dr. Alu, her longtime family

physician.  When asked about plaintiff's ability to return to work, Dr. Alu stated that plaintiff could not return to her previous job, and lacked the training to assume the jobs recommended by defendant's vocational expert.

The policy in question here provided disability coverage for insureds who could not perform their jobs for twenty-four months.  To obtain coverage, a party need only demonstrate an inability to continue in her current position.  Plaintiff received coverage for this situation.  After twenty-four months of coverage, however, defendant had a policy right to terminate coverage if the medical evidence indicated that plaintiff was able "to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation" for which her "training, education, experiences, age, physical and mental capacity" suited her.  (See R. at LL-0005).

Here, plaintiff alleges a procedural bias in the defendant's decision.  "Evidence that an [ERISA] administrator's decision was incorrect, coupled with evidence that it was biased, can add up to a conclusion that its decision was not the product of reasoned discretion, but of anti-claimant bias, in which case the decision should be reversed."  Post, 501 F.3d at 165.  The Third Circuit has pointed to the sorts of "irregularities" that could indicate bias: "(1) reversal of position without additional medical evidence; (2) self-serving selectivity in the use and interpretation of physicians' reports; (3) disregarding staff recommendations that benefits be awarded; and (4) requesting a medical examination when all the evidence indicates disability."  Id. at 164-65.

16

Plaintiff has the burden of providing evidence by which a jury could conclude that irregularities occurred.  Here, she has produced no evidence of such procedural irregularities or biases.  The defendant did not reverse any coverage decisions in the case, did not disregard the opinions of any doctors, had no recommendations that coverage be awarded, and did not seek additional medical evidence in an attempt to overturn a recommendation for coverage.  Instead, in this case, plaintiff argues that defendant disregarded medical opinions from her doctors that determined that she could not work at any occupation for which she was trained or could be trained.  She points out that Dr. Millstein, the defendant's consulting physician, had never examined the plaintiff and thus had no independent basis for his opinion.[2]  She also points to the opinion of her primary care physician, Dr. Alu.  Dr. Alu responded to defendant's December 1, 2006 request for information on plaintiff's work capacity by denying that plaintiff could return to her regular duties.  (See R. at LL-394).  She reminded defendant that "Rita has not been trained to work in a 'sedentary capacity. I do not feel this is appropriate and that she continues to be disabled from her regular work duties."  (Id.).

Defendant's decision that plaintiff could perform sedentary work in a number of nursing-related capacities that did not expose her to direct patient contact does not contradict Dr. Alu's position on the matter.  Defendant agreed with Dr. Alu that

---

[2]Courts in this circuit have found that an insurer may rely on interpretations of records produced by others rather than performing their own physical examinations of plaintiffs, but that "courts must still consider the circumstances that surround an administrator ordering a paper review."  Post, 501 F.3d at 166.

17

plaintiff could not return to her previous nursing position.  Since Dr. Alu was not

trained as a vocational expert but as a physician, her opinion on plaintiff's ability to

perform the jobs proposed by plaintiff after training is not material to defendant's

conclusions about plaintiff's capacities.  Her opinion that plaintiff could not resume

her earlier position is not relevant to the question of whether she could return to any

job for which she could become qualified by her training and experience.

Defendant–and Dr. Millstein in particular–did not, therefore, disregard Dr. Alu's

medical opinion.[3]  Dr. Alu was the only physician who treated plaintiff who directly

disagreed with defendant's decision that plaintiff could return to sedentary work in a

setting that did not raise an increased risk of infection, and Dr. Alu's conclusion on

that matter was not based on a medical evaluation, but on an assessment of

plaintiff's vocational capabilities.

Plaintiff also points to the opinion of Dr. John Rothschild, contending that Dr.

Rothschild offered the opinion that plaintiff's condition rendered her unable to work.

---

[3]After a telephone conversation with Dr. Alu, Dr. Millstein wrote her to confirm that "[f]rom a physical standpoint you agree that Ms. Humble has the ability to perform full time sedentary jobs such as that of a telephonic advice nurse, recertification nurse, or utilization review nurse in a non-patient care setting such as a regular office setting but not a medical office or hospital setting where she would be at increased risk of exposure to sick persons." (See R. at LL-0206).  Dr. Alu's disagreement with the defendant's conclusions about plaintiff's capacities, then, were not based on its medical assessment but on Dr. Alu's concern that "Ms. Humble may not have the appropriate training or experience to perform these jobs and such positions may not be available in your area."  (Id.).  The dispute here, then, was not a medical one, but one about plaintiff's ability to perform new types of work. Plaintiff does not point to any alternative vocational assessment, however, to show that defendant was unjustified in finding that plaintiff could perform the various occupations. Without any medical or occupational evidence to challenge defendant's opinions, we cannot overturn them.

(Plaintiff's Brief in Support of her motion for summary judgment (Doc. 15) at 8). .

Plaintiff's statement of material facts indicates that Dr. Rotschild treated plaintiff for

her kidney troubles, diagnosing her with polycystic kidney disease and other

disorders and eventually recommending transplant surgery.  (Plaintiff's Statement at

¶¶ 21-23).  While we agree that plaintiff suffered from kidney difficulties and that Dr.

Rothschild recommended various treatments for them, we do not find that plaintiff

has pointed to any evidence by which a jury could conclude that Dr. Rothschild

opined that plaintiff could not work at any occupation.  Indeed, the January 2006

"Functional Capacities Form" Dr. Rothschild completed for the defendant and cited

by plaintiff as evidence that he found her unable to perform any occupation does not

indicate that Dr. Rothschild found any particular restrictions necessary for the

plaintiff.[4]  (Id. at LL-0704).  A jury could not find that defendant ignored Dr.

Rothschild's medical opinion on her limitations in concluding that she did not meet

the plan's disability definition.

In addition, plaintiff's other doctors confirmed that she had the physical

capacity to return to sedentary work that did not expose her to a high risk of

---

[4]This record asks the doctor if plaintiff has restrictions in a number of different areas, such as "sitting, standing, walking, squatting, bending, kneeling" and other work-related areas.  (See R. at LL-0704).  Dr. Rothschild did not list any restrictions, but appears as well to indicate that he has not made an assessment in those areas and is thus not qualified to do so.  This evidence does not necessarily indicate that Dr. Rothschild felt that plaintiff had no restrictions as a result of her kidney disease.  No reasonable jury could find, however, that defendant disregarded a medical opinion on plaintiff's limitations provided by Dr. Rothschild.  On the form provided by defendant to Dr. Rothschild for such an opinion, he declined to offer one.  Defendant cannot be seen to contradict an opinion it was not provided.

infection.  (See Elizabeth Kiernan to Dr. Santosh Potar, December 1, 2006 (affirming that plaintiff could return to work in a sedentary capacity) R. at LL-0411; Kiernan to Dr. Brant Fulmer, December 1, 2006 (same) R. at LL-0368).   Accordingly, plaintiff's complaint that defendants improperly ignored the opinion of her treating physician is not supported by the evidence.  None of plaintiff's doctors actually indicated that she could not perform sedentary work as a result of her ailment, and defendant thus did not disregard the opinion of any doctor who concluded that plaintiff could not work in the jobs defendant proposed.  While plaintiff may have felt unprepared for or disinterested in the positions proposed by the defendant, the policy in question does not provide coverage when an insured dislikes the proposed jobs, but only when she is unable to perform them.  Plaintiff thus has not met her burden of producing evidence, medical or otherwise, that indicates that defendant's position on her employability was arbitrary and capricious, even considered on a sliding scale.

### b.  Failure to Account for the Effect of Plaintiff's Nephrectomy

Plaintiff argues that defendant did not properly examine the results and effect on her employability of a nephrectomy she underwent on June 30, 2006.  Defendant, plaintiff contends, continued to base its evaluations on information gathered before removal of her right kidney, and not based on additional limitations this operation may have caused.  She points particularly to the fact that defendant relied upon the opinion of Dr. Hopkins, rendered before plaintiff underwent her nephrectomy.  Such disregard for the results of that surgery, plaintiff insists, constitutes a willing

disregard of her medical condition that should lead the court to find that the

defendant selectively used or disregarded relevant medical information.

We conclude that defendant's decision to deny benefits was not arbitrary and

capricious in relation to the operation to remove plaintiff's right kidney.  Plaintiff's

position disregards the facts of the case.  After being informed that plaintiff had

undergone a new operation, defendant sought updated medical information from the

plaintiff and plaintiff's physicians.   (See Elizabeth Kiernan to Dr. Brant Fulmer,

September 8, 2006, R. at LL-0477; Kiernan to Dr. John Rothschild, September 8,

2006, R. at LL-0479; Kiernan to Dr. Nicole Alu, September 8, 2006, R. at LL-0537;

Kiernan to Rita Humble, September 8, 2006, R. at LL-0546 (requesting that she

contact Drs. Alu, Rothschild and Fulmer to release records)).  As related above,

those handling plaintiff's appeal also sought supplemental medical information.  In

addition, defendant delayed a decision on plaintiff's eligibility for benefits until after

plaintiff recovered from her operation.  (See Claim Note 60 at LL-048 (stating that

claim "decision delayed based on recent surgery").  Defendant did not render its

decision on plaintiff's status until February 23, 2007, nearly eight months after

plaintiff's operation and long after her doctors concluded she had recovered.  Plaintiff

has not produced evidence by which a jury could conclude that defendant ignored

her changing medical condition in deciding that she could return to sedentary work

after she recovered from her operation.

Further, plaintiff has produced no evidence to indicate that defendant

disregarded the opinions of plaintiff's physicians after her surgery, since two of

plaintiff's doctors agreed that she could perform sedentary work in settings that

lacked a heightened risk of infection.  (See LL-0368, Letter dated December 1, 2006

to Dr. Brant Fulmer (confirming that he is "in agreement with Rita Humble having a

sedentary work capacity"); Letter to Dr. Pedosta at LL-0368 (confirming that he is "in

agreement with Rita Humble having a sedentary work capacity")).  Medical evidence

gathered after plaintiff underwent her operation thus supports the defendant's

disability determination.  Plaintiff's doctors agreed that the nephrectomy did not

make work in a sedentary capacity impossible.

The court does not find that the fact that plaintiff underwent a nephrectomy

after Dr. Hopkins rendered her opinion makes defendant's decision arbitrary and

capricious.  Dr. Hopkins noted in her opinion that plaintiff may have to have her

kidney removed, and that such removal would influence the date on which she could

resume working in sedentary, non-contagious environments.  None of plaintiff's

doctors concluded that the after plaintiff recovered from the operation she would face

additional limitations on her ability to work.  Since the company delayed denial of

benefits until plaintiff recovered from her surgery and followed the opinions of her

doctors in evaluating the affect of that surgery on her ability to work, we cannot find

the company's continued reliance on Dr. Hopkins's opinion arbitrary and capricious.

Instead, defendant relied on an opinion that reflected the position of plaintiff's own

doctors.  Plaintiff has not met her burden to produce evidence by which a jury could

22

conclude that defendant acted in an arbitrary and capricious manner in making its disability determination.

Further, plaintiff's own position on her physical status following the nephrectomy supports defendant's position.  Plaintiff filled out a vocational questionnaire for defendant on September 15, 2006, after she underwent the operation.  In that questionnaire plaintiff related that after she was able to perform essentially the same daily activities as before her operation.  The operation, as plaintiff herself reported, resulted in no appreciable change to her physical capacity. Accordingly, defendant did not ignore relevant medical or other evidence in determining that plaintiff's occupational capacity had not changed after the nephrectomy.  We therefore cannot find that the defendant's decision was arbitrary and capricious, even using the "sliding scale" approach mandated by <u>Pinto</u>.  All sides agreed that plaintiff could not return to her previous work as a result of her medical condition, but plaintiff and her doctors admitted that her capacity to work did not change after her second surgery.  Plaintiff has not produced any evidence by which a jury could conclude that defendant ignored a doctor's opinion, and indeed the evidence indicates that defendant's position on plaintiff's ability to work mirrored her own.   Because defendant agreed with plaintiff about the conditions of her return to work, Libertys Life's decision that she could return to work in a sedentary capacity was not arbitrary and capricious.

**Conclusion**

23

For the above stated reasons, we will grant the defendant's motion for summary judgment.  Plaintiff is not entitled to coverage under the long-term disability policy in question here.  While the evidence clearly demonstrates that plaintiff can no longer perform her previous job, her disability policy offers coverage only when she is unable to work at any job for which she could become suited given her experience and training.  Since we are required in an ERISA action to ensure that the parties abide by the terms of the insurance policy, we must conclude that plaintiff is not entitled to benefits.  An appropriate order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RITA HUMBLE, | : | No. 3:07cv1464 |
| Plaintiff | : | |
| | : | (Judge Munley) |
| | : | |
| v. | : | |
| | : | |
| LIBERTY LIFE ASSURANCE | : | |
| COMPANY OF BOSTON, | : | |
| Defendant | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

### ORDER

**AND NOW**, to wit, this 9th day of June 2008, defendant's motion for summary

judgment (Doc. 12) is hereby **GRANTED**. Plaintiff's motion for summary judgment

(Doc. 14) is hereby **DENIED**. The Clerk of Court is directed to **CLOSE** the case.

**BY THE COURT:**

**s/ James M. Munley**
**JUDGE JAMES M. MUNLEY**
**UNITED STATES DISTRICT COURT**